## WESTERN ASSUR. CO. v. REDDING.

(Circuit Court of Appeals, Fifth Circuit. June 20, 1895.)

### No. 372.

**1. Fire Insurance—Promissory Warranty.**

Plaintiff, the keeper of a country store, held a policy of insurance on his stock of goods, issued by the defendant company, which contained a clause providing that it was one of the conditions of the policy that plaintiff should keep a set of books showing a complete record of his business, purchases, and sales, take an itemized inventory at least once a year, keep such books and inventory in a fireproof safe, and produce the same in case of loss, and that failure to comply with such conditions should avoid the policy. Plaintiff's store and stock were destroyed by fire, and, in an action subsequently brought against the insurance company, it appeared that he kept a set of books in a primitive and unskillful manner, which books were all in the safe, and were produced, except a cash-sales book, covering 21 days before the fire, which had been inadvertently left out of the safe and burned; that such books showed plaintiff's purchases and credit sales, and some of his cash sales, as well as the result of an inventory taken a short time before the fire. *Held*, that the promissory warranty contained in the "safe clause" aforesaid was a condition subsequent, only, and that the facts shown were sufficient to justify a finding of compliance therewith. Per McCormick, Circuit Judge, and Bruce, District Judge.

**2. Same.**

*Held*, that a literal fulfillment of the promissory warranty contained in such clause was requisite, and it was error to instruct the jury that a substantial compliance was all that was necessary. Per Pardee, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Southern District of Florida.

This was an action by Joseph H. Redding against the Western Assurance Company on a policy of insurance. Judgment was rendered for the plaintiff in the circuit court. Defendant brings error. Affirmed.

W. A. Blount, for plaintiff in error.

J. M. Stripling, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and BRUCE, District Judge.

McCORMICK, Circuit Judge.    Joseph H. Redding, the defendant in error, "kept store" in a country station town in Florida.    He commenced the business January 2, 1893.    He testifies that he took an inventory of his stock in February, 1893, but that inventory was destroyed when the store was burned.    On the 10th day of February, 1893, he insured with the plaintiff in error, the Western Assurance Company, organized under the laws of Toronto, Canada, his stock of goods and other property, taking $1,000 on the stock of goods.    On the morning of the 1st of October, 1893, a fire occurred, which consumed his store and the stock of goods insured.    His policy contained the clause which is known as the "iron-safe clause," and is in these words:

"It is a part of the conditions of this policy that the insured shall keep a set of books showing a complete record of business transacted, including all purchases and sales, both for cash and credit, and take an itemized inventory of stock on hand at least once every year; and it is further agreed that insured will keep such books and inventory securely locked in a fireproof safe at night, and at all times when the store mentioned in this policy is not actually open for business, or in some secure place, not exposed to fire which would destroy the house where said business is carried on. It is further agreed that, in event of loss, insured will produce said books and inventory. Failure to comply with these conditions shall render this policy null and void, and no suit or action at law shall be maintained thereunder for any loss."

Payment of the loss was refused and recovery resisted on the ground that the insured had not kept the set of books contemplated by that clause, and that one of the books he claims to have kept was left out of the safe, and was consumed by the fire.    On the trial the insured and one other witness, H. T. Shackleford, gave testimony tending to prove: That the storehouse and stock of goods described in the policies were burned at 2 or 3 o'clock in the morning on October 1, 1893,—not during business hours, and when the store was closed.    That the value of the stock of goods in the store at the time of the fire, and consumed, was about $4,900.    That the insured had taken an itemized inventory of stock, which he had completed on the 16th of September, 1893.    That he had received, between the time of the completion of the inventory and the occurring of the fire, $318.72 worth of goods, which went into the store.    That he kept in his business a set of six books, which he produced, and which, by order of the trial court, were sent up to this court.    That these books showed the state of his business, and were all the books which he kept, except a cash-sales book, which he opened or began 9th of September, 1893 (21 days before the fire), in which he made daily entries of cash sales up to the time of the fire.    That this book was destroyed in the fire which destroyed the stock of goods; it having been inadvertently left out of the safe, on a desk, on the night of the fire.    That he began business on January 2, 1893.    The cash-sales book during that time shows daily receipts from cash sales for January aggregating $76.05.    For February: Wednesday, 1st, $0.50; Thursday, 2d, $1.50; Friday, 3d, $0.00; Saturday, 4th, $2.50.    Then the business days of the next three weeks are entered by names, and the receipts for each week are extended, showing $4.80 for the first of these three weeks, $6.75 for the second, $8.00 for the third,

and for the last two days of the month, Monday 27th, $1.00, and Tuesday 28th, $0.50, aggregating for the month $25.00. The first four days of March the entries are made for each day, then for from 6th to 11th, 13th to 18th, 20th to 25th, 27th to 1st, being the business days in the weeks, the entry showing the weekly receipts aggregating for that month $24.75,—and so it runs, showing for April, $36.00; for May, $23.60; for June, $31.25; for July, $25.40; for August, $25.75; for Friday, September 1st, $0.50; Saturday, September 2d, $2.50; September 4th to 9th, $9.75. The inventory of stock, closed September 16th, shows a footing up of $4,906.12. The insured, corroborated by Shackleford, testified that the entries to bills payable, aggregating $1,000.18, showed all his purchases from January 2, 1893, to the time of the fire. The books show entries of credit sales through the whole period, with bills of particulars. These books had been locked in the safe; were in the safe, in the store, at the time of the fire; and were not materially damaged. Viewed as "a set of books," from the standpoint of an expert in that scientific system of bookkeeping which obtains in the business of an insurance company which has pushed its business at least from the chief city of Canada to the obscure hamlet of Greenville, Fla., these books in evidence are primitive to a degree that may test his temper, if not his skill; but to impartial jurors, patiently searching for proof to support a recovery on a contract of indemnity for a loss insured against, and incurred without fraud or fault on the part of the insured, these books tell a plainer story than the expert unconsciously or strenuously looking to them for ground of forfeiture was able to read in them. He could make nothing out of their entries to show that the insured had on hand in his store, at the time of the fire, goods to such an amount in value that three-fourths thereof exceeded the amount of insurance written thereon, or to show that the insured had any goods in the store at the time of the fire. To our view, the very imperfections of these books vouch their good faith. It is insisted that the accounts of goods purchased should have set out the specific articles, and the value of each, and that the account of cash sales should have been equally particular as to articles sold, and the price; for, it is argued, the insured may have sold goods at one-tenth of their cost price, for aught that appears in these entries of cash sales. If these accounts were to have been thus kept, thus itemized, why not have said so? There was time and space in the clause in question to provide expressly that the inventory of stock to be taken at least once every year "should be itemized." If the accounts of purchases and sales were to be so itemized, why take stock at all? The credit sales are itemized, as is not only customary, but necessary. Now, when the articles purchased, the goods sold on credit, and those sold for cash, are all itemized, posted, footed up, and balanced, barring moths, rust, and thieves, the difference would show the goods remaining; and the time spent, and shop wear of the stock, would either be wholly unnecessary, or, in the average country store, an expensive and worthless check on unscientific bookkeeping. When the circumstances of these respective parties are impartially considered, it is highly improbable that such a degree

of extravagance or of proficiency in bookkeeping on the part of the insured was in the contemplation of either of them, and certainly was beyond the conception of the insured, and cannot be considered to have been in the mind of the agent of the insurer, without a high impeachment of his integrity, for he must have known that such a set of books as the contention now made by his company requires would not be kept.

It is well known that our law of insurance had its beginnings in marine risks. Parties willing and offering to indemnify against such risks for a consideration did not, and perhaps yet do not, by their agents, compass sea and land to find a subject; but those with ships or goods at hazard, either in person or by a broker, who is in fact the agent of the applicant, seek the protection they need by bringing their subjects to the attention of those whose business it is to furnish such insurance. These applicants gave what are called instructions for writing the policy, which, besides naming the ship, her burden, cargo, and voyage, embraced such other matters as were supposed to constitute inducements to the contract, or to affect the rate of premium. These instructions were either oral or written, or partly oral and partly written. But in the earlier years of Lord Mansfield's service on the bench it was not the usage to consider the instructions as a part of the policy. Parol instructions were not entered in a book, nor written instructions kept, till, on the occasion of actions brought before him where brokers had made false representations in many matters material to the risk, that judge advised the insured to bring actions against the brokers, which some did, and recovered; and the brokers thereafter, on his lordship's caution and recommendation, began the practice of entering all representations made by them in a book. Even at that early day there was no distinction better known than that which exists between a warranty or condition which makes part of a written policy, and a representation of the state of the case. Where it is a part of the policy it must be performed, is the doctrine of all the cases. Good faith is a necessary element of all binding contracts. And where insurance is effected as marine insurance formerly was, and generally is still written, the situation of the parties requires the exercise of the utmost good faith. In enforcing this requirement against unfaithful parties, rules were announced and followed which conditions then existing demanded, but, by reason of the gradual and great development of a change in the relations of parties to these contracts, these rules, though once wholesome and necessary, have become severe, and, with the well-known tendency towards the growing weight of precedents, have often been applied to cases and in a manner not within Lord Mansfield's reasonings. He says, with his peculiar force, "a warranty in a policy of insurance is a condition or a contingency, and unless that be performed there is no contract." De Hahn v. Hartley, 1 Term R. 343. In the case just cited there was written on the margin of the policy, "Sailed from Liverpool with 14 six pounders, swivels, small arms, and fifty hands or upwards." The ship sailed from Liverpool 13th October, 1778, with only 46 hands, but six hours after sailing she touched at Beaumaris, and took on

6 more hands, continuing her voyage with a force of 52 men, which she kept and had till her capture, 14th March, 1779, six months after sailing from Liverpool. The insurer, in ignorance of the facts, had paid the loss, but recovered it back, because there was no contract. Now if, instead of sailing from Liverpool with only 46 hands, the Juno had sailed with 52 hands, and on the 13th of March, 1779, the day before her capture, 6 of her men had seized one of her life boats and deserted, so that when she was attacked by the public enemy she had only 46 hands with which to repel force by force, does any one suppose that Lord Mansfield, or any other sane judge, would have held that by reason of that fact alone there was no contract at the time when the capture and loss occurred? Out of the business of marine insurance, or superinduced thereby, the business of fire and life insurance has sprung, and grown till it fills all the land, and its cases overflow the courts and their reports. The relations of the parties are reversed. The policies in current use are travesties on the common-sense form in use in marine insurance. And while the distinctions and construction announced in Pawson v. Watson, Cowp. 785, and in De Hahn v. Hartley, supra, are too well settled to be disturbed by judicial action, there has long been a marked and growing judicial sense that the application of these, and later cases in line with them, should not be carried beyond the boundaries of controlling precedents; that common honesty and common sense are safe guides in the construction of even these wonderfully devised contracts. While, therefore, it is certainly the law that a precedent condition warranted to exist must in fact exist, exactly as stated, or there will be no contract, because the minds meet only on all the stipulated conditions, a promissory warranty is often, if not always, necessarily a condition subsequent, and courts should and do and will apply to these the doctrines that obtain in adjudging forfeitures. It would too greatly extend this opinion to review the cases. Many of them are cited and epitomized in the third edition of May on Insurance, in the chapters on Warranties, Representations, and Exceptions. We think the application to the case at bar of what we have here advanced is apparent. The judgment of the circuit court is affirmed.

PARDEE, Circuit Judge (dissenting). On January 9, 1892, the Western Assurance Company, plaintiff in error, a corporation of Canada, insured Joseph H. Redding, defendant in error, a citizen of Florida, for three years, for $1,000, on a dwelling house in Greenville, Fla. On February 10, 1893, it insured him, for one year, for $800 on his store building in the same city, for $1,000 on his stock of merchandise in said store, and $200 on his fixtures therein. The store and contents were destroyed by fire at 2 or 3 o'clock on the morning of October 1, 1893, and the dwelling on the night of the same day. The Western Assurance Company, claiming that the fire was the result of incendiarism, which Redding had reason to anticipate, and claiming that Redding had not kept and produced his books as required by the policy, declined to pay the loss. Redding brought suit in the court below, embracing in his declaration two counts,—

the first one upon the policy insuring the store and contents, and the second upon the policy insuring the dwelling. The plaintiff pleaded to the first count, setting up, generally, that Redding had not kept a set of books as required by the policy, nor kept them safely; that they were burned in the fire which destroyed the property; and that he did not produce them after the fire. Redding took issue upon all these pleas, a jury trial was had, and a verdict rendered for the plaintiff for the face of both the policies and interest. The only exceptions insisted upon in this court are some taken by the Western Assurance Company to different portions of the judge's charge, and the judge's refusal to give certain special charges asked by it. The policy upon the store and contents contained the following clause:

"It is a part of the conditions of this policy that the insured shall keep a set of books showing a complete record of business transacted, including all purchases and sales, both for cash and credit, and take an itemized inventory of stock on hand at least once every year; and it is further agreed that insured will keep such books and inventory securely locked in a fireproof safe at night, and at all times when the store mentioned in this policy is not actually open for business, or in some secure place, not exposed to fire which would destroy the house where said business is carried on. It is further agreed that, in event of loss, insured will produce said books and inventory. Failure to comply with these conditions shall render this policy null and void, and no suit or action at law shall be maintained thereunder for any loss."

The trial judge refused several special charges requested by the defendant in the court below, to the general effect that under the evidence in the case there had been a breach of the above-mentioned stipulation, and that the jury should find that the defendant was not liable on his contract of insurance for the stock of merchandise. The court did charge the jury, after reading the above stipulation, and commenting upon its reasonableness, as follows:

"But as I suggested in your hearing yesterday, that all that can be demanded is a substantial compliance with that, and whether there was a substantial compliance,—whether, in some minutiae, some matter of no special importance, there may have been a variation from that,—that is a question; but the court instructs you that there is required, by the policy, a substantial compliance with that clause."

—And further, after submitting to the jury, as a question of fact, whether the books produced by the plaintiff showed a complete record of his business, as follows:

"The language of the clause of the policy is this: 'It is agreed that, in event of loss, assured will produce said books and inventory.' You have heard the testimony in regard to the production of those books, and you will determine, gentlemen, whether that was a substantial compliance with the terms of the policy. One party, the insurer, states he simply produced two books,—the ledger, and what is known as the 'Stock Book,' which simply contained the inventory. The party plaintiff claims that he produced those books, all except the cash book, and had not found that. The nonproduction of the cash book is accounted for by saying it was mislaid. It is also in testimony that the cash book which was in use at the time of the fire was not produced at all, but was consumed, and was left, as stated by the witness, upon a desk in the store, and was consumed in the fire."

Proper exceptions were taken in time by the defendant in the court below to the above charges given.

It ought not to be disputed that the provision in the policy of insurance with reference to the books commonly called the "iron-safe clause" is a warranty. Insurance Co. v. Wilkerson (Ark.) 13 S. W. 1103; Kelley-Goodfellow Shoe Co. v. Liberty Ins. Co. (Tex. Civ. App.) 28 S. W. 1027; and authorities cited in said cases. It cannot be disputed that the parties to the policy had the right to make the stipulation, and that it should be construed and enforced, like all other contracts, according to the understanding and intent of the parties. In Dwight v. Insurance Co., 103 N. Y. 341, 346, 8 N. E. 654, it is said:

"Parties to an insurance contract have the right to insert such lawful stipulations and conditions therein as they may mutually agree upon, or which they may consider necessary and proper to protect their interests, and which, when made, must be construed and enforced, like all other contracts, according to the expressed understanding and intent of the parties making them. If an insurance policy, in plain and unambiguous language, makes the observance of an apparently immaterial requirement the condition of a valid contract, neither courts nor juries have the right to disregard it, or to construct, by implication or otherwise, a new contract in the place of that deliberately made by the parties."

In Imperial Fire Ins. Co. of London v. Coos County, 151 U. S. 452, 462, 14 Sup. Ct. 379, Mr. Justice Jackson, for the court, says:

"Contracts of insurance are contracts of indemnity upon the terms and conditions specified in the policy or policies embodying the agreement of the parties. For a comparatively small consideration the insurer undertakes to guaranty the insured against loss or damage, upon the terms and conditions agreed upon, and upon no other; and when called upon to pay, in case of loss, the insurer, therefore, may justly insist upon the fulfillment of these terms. If the insured cannot bring himself within the conditions of the policy, he is not entitled to recover for the loss. The terms of the policy constitute the measure of the insurer's liability, and in order to recover the assured must show himself within those terms; and if it appears that the contract has been terminated by the violation, on the part of the assured, of its conditions, then there can be no right of recovery. The compliance of the assured with the terms of the contract is a condition precedent to the right of recovery. If the assured has violated, or failed to perform, the conditions of the contract, and such violation or want of performance has not been waived by the insurer, then the assured cannot recover. It is immaterial to consider the reasons for the conditions or provisions on which the contract is made to terminate, or any other provision of the policy which has been accepted and agreed upon. It is enough that the parties have made certain terms conditions on which their contract shall continue or terminate. The courts may not make a contract for the parties. Their function and duty consist simply in enforcing and carrying out the one actually made."

A warranty is to be strictly complied with, in order to avoid the breach of a contract. In the early case of Pawson v. Watson, Cowp. 785, Lord Mansfield held that a substantial compliance with the warranty is never sufficient, saying:

"Nothing tantamount will do, or answer the purpose. It must be strictly performed, as being a part of the agreement."

Again, in De Hahn v. Hartley, 1 Term R. 343, Lord Mansfield said:

"A warranty in the policy of insurance is a condition or a contingency, and unless that be performed there is no contract. It is perfectly immaterial for what purpose the warranty is introduced, but, being inserted, the contract does not exist, unless it be literally complied with; and Lord Ashurst said: 'The very meaning of a warranty is to preclude all questions whether it has been substantially complied with. It must be literally so.'"

The law, as declared in these cases, has been recognized and followed in a long line of uniform decisions; and it would seem to be now settled and established law, in insurance cases, if in no others, that a present warranty must be literally true, and a promissory warranty must be literally fulfilled, otherwise recovery is defeated. May, Ins. (3d Ed.) § 156; Wood, Ins. p. 448. If there are adjudged cases to the contrary, I doubt their authority. In saying this, I am not referring to that large class of cases in which the courts have construed stipulations which the insurance company considered a warranty to be merely representations which, so far as the case in hand was concerned, were not material, nor to that other class of cases where the denominated "warranties" have been held to have been modified by other provisions in the policy. See Insurance Co. v. Johnston, 80 Ala. 467, 2 South. 125, and cases there cited. In the present case the trial judge charged the jury that a substantial compliance with the warranty was all that was necessary, and, so far as I can find in the record, he did not instruct the jury what he meant by a "substantial compliance." In my opinion, this charge was erroneous, because it was not in accordance with the law, and tended to mislead and confuse the jury. It substantially, if not literally, instructed the jury that, with regard to the compliance with a warranty, they might substitute their own judgment of what was necessary, what was reasonable, and what was equitable. A substantial compliance with a warranty is a very uncertain matter, depending upon the knowledge, relations, and prejudices of the individual called upon to pronounce. A warranty by a merchant not to store gunpowder in his store building is substantially complied with, in the mind of the ordinary juror, as well as to the satisfaction of some judges, when he only stores it once in a while; and a warranty not to use gasoline and other explosive fluids in the insured property is substantially complied with when gasoline is only used once a week,—say on extra occasions. The defendant in this case, according to the evidence, substantially complied with the warranty to keep books, and save them for the information of the insurer, by keeping a full set of books up to within 30 days before the fire, although he thereafter omitted to keep just the book which would have informed the insurer of the amount of goods he had on hand at the time of the fire. He substantially complied with his warranty to keep his books in an iron safe by putting, on the evening before the fire, all the books in the safe, except one, which happened to be the one which would inform the insurer of the amount and value of the goods destroyed by the fire. In my opinion, the judgment of the circuit court should be reversed for error in instructions to the jury.