## CROWLEY et al. v. NORTH BRITISH & MERCANTILE INS. CO., Limited.

## SAME v. QUEEN INS. CO. OF AMERICA.

### Civ. Nos. 619, 620.

District Court, W. D. South Carolina, Spartanburg Division.

March 10, 1947.

J. Davis Kerr and C. E. Daniel, both of Spartanburg, S. C., for plaintiffs.

Stephen Nettles, of Greenville, S. C., and S. R. Watt, of Spartanburg, S. C., for defendants.

WYCHE, District Judge.

These actions are for the recovery of the full amount of insurance under two identical policies of fire insurance issued by the respective defendants covering the contents of the plaintiffs' waste warehouse located on Exchange Street in Spartanburg, South Carolina, which, with its contents,

was totally destroyed by fire on December 20, 1944. They were simultaneously commenced in the Court of Common Pleas for Spartanburg County, and removed to this Court, where they were consolidated for hearing and decision.

The complaint alleges that the plaintiffs are partners engaged in the waste business, and owned and operated a waste warehouse located at 314 Exchange Street, Spartanburg, South Carolina, in which there was continuously stored various types of waste, the stock being substantially in constant flux because of incoming and outgoing merchandise in ordinary course of business; that the defendants are fire insurance corporations licensed to do and engaged in that business in South Carolina; that on June 23, 1944, each defendant, in consideration of the premium paid or agreed to be paid, issued identical policies insuring plaintiffs against loss or damage by fire to the merchandise stored in the warehouse to an amount not exceeding the cash value of such merchandise and not exceeding, in any event, $37,500 each, for the period from June 23, 1944, to June 23, 1945; that the warehouse and its contents were totally destroyed by fire on December 20, 1944; and that the actual cash value of the merchandise destroyed was at least $75,000; that the plaintiffs gave notice and furnished the proofs of loss required by the policies and complied with and performed all other policy conditions, making available to the defendants' adjusters, and an auditor, selected by them, all their books and records relating to the goods and merchandise stored in the warehouse at the time of the fire; that while not denying liability, the defendants, through professed repeated examinations and audits of plaintiffs' records, and piecemeal objections presented from time to time, had brought about a delay legally equivalent to a refusal to pay.

The answers admitted the partnership and business of the plaintiffs; that the defendants issued the policies of insurance as alleged and that they were in effect at the time of the fire, which totally destroyed the warehouse, and its entire contents, and that notice and proofs of loss were furnished and the proofs retained by the defendants.

Defendants, though alleging other specific insurance, offered no supporting proof and argued nothing in respect to it, thus eliminating that issue.

As a further defense, which defendants' counsel characterized in argument as a qualified general denial, the answer alleges the following from the policy provisions: "Requirements in case of loss: The insured shall * * * furnish a complete inventory of the destroyed, damaged and undamaged property, stating the quantity and cost of each article and the amount claimed thereon; and the insured shall, within sixty days after the fire * * * render to this Company a proof of loss, signed and sworn to by the insured, stating * * * the interest of the insured and of all others in the property, the cash value of each item thereof, and the amount of loss or damage thereto * * *. The insured * * * as often as is reasonably required, shall produce for examination all books of account, bills, invoices, and other vouchers, or certified copies thereof, if originals are lost, at such reasonable time and place as is designated by this Company or its representatives, and shall permit extracts and copies thereof to be made."

An amendment to the answer alleges the following from the provisions of the policy: "No suit or action on this policy, for the recovery of any claim, shall be sustainable in any court of law or equity unless the insured has complied with all the requirements of this policy, nor unless commenced within twelve months next after the fire."

Defendants then allege that their adjuster and auditor, in checking the proofs of loss against the plaintiffs' books discovered that the books failed to show the amount of each type of waste on hand at the insured's location at the time of the fire, or to show accurately the cost thereof; that without this information, the liability of the defendants could not be determined, whereupon, they urged plaintiffs to take the necessary steps to establish a correct inventory and correct values; that plaintiffs failed to do this, and that such failure is a breach of the policy conditions barring recovery.

On call of the trial roster at the convening of the February, 1946, term of court at Spartanburg, plaintiffs announced ready and, after defendants' motion for continuance was overruled, both cases were tentatively set for jury trial on February 20, 1946. Counsel for defendants then asked for a pre-trial conference, which was granted, and entered upon that same afternoon.

After a discussion of the pleadings, issues and methods of proof at the conference, counsel for defendants applied for the appointment of an independent auditor to audit plaintiffs' records. Plaintiffs objected on the ground that they had already, at considerable expense, caused an audit to be made by a competent certified public accountant, who had assembled and segregated the items on which the audit was based in a manner that would assist in their introduction and publication in evidence.

I decided that I would not order an independent audit made at the expense of the plaintiffs, but would order it made at the expense of the defendants. Counsel for defendants then asked for the audit on the terms suggested by me. Thereupon, counsel agreed that the cases be tried by the court without a jury, at a date to be fixed. Appropriate orders were entered continuing the cases, and appointing Messrs. Winn & Winn, certified public accountants, of Greenville, South Carolina, to make the audit and furnish copies to both sides.

The description of the nature and customary conduct of the waste business furnished by the undisputed testimony will aid in an easier understanding of the pleadings, policies and proof.

Waste is a by-product of the textile manufacturing mills. As its name implies, it is unusable for any of their purposes, but, being useful for many other purposes, and salable, the waste business has developed with trade customs and a terminology of its own. The names of the types, such as card strips, fly, motes, sweeps, and the like, denote the respective stages of the manufacturing process from which they are derived, and signify to the trade the approximate value differentials.

The mills, as a rule, contract for the sale of their waste in advance, for three or six-month periods, baling it, and, for lack of warehousing space, requiring monthly or semi-monthly removal, thus necessitating the maintenance of warehouse facilities by the dealer.

While most of the mills use presses turning out bales averaging 500 pounds, there is variation among the mills in size and capacity of presses used. Dealers, through experience, know the average weight bale produced by the respective mills from which they purchase.

Plaintiffs, as is customary with dealers, occasionally tear down incoming bales to sort out and separate the better from the lower types, which are separately rebaled. This varies the types, but poundage remains constant. The results of the sorting operations are reflected by the records only in the balancing of the stock cards. According to the testimony of Mr. Dodge, an accountant produced as a witness for the plaintiffs, it is not customary, and would be prohibitively expensive to maintain detailed records of the sorting results. Sorting is not processing, as known to the trade, and plaintiffs are not processors.

The policies of insurance are of the type known in the insurance field as the "monthly reporting form" designed to afford the requisite flexibility of coverage and premium incident to a constantly changing value of merchandise insured. The premiums are calculated at $1.01 per $100 of coverage, 75% of the premium for the maximum coverage being paid in advance and the ultimate premium for the period being determined by averaging the merchandise insured on the basis of the monthly reports required of the insured.

The reports for the months of June through November, 1944, showed estimated values on hand as follows: June 30, $69,100; July 31, $71,100; August 31, $74,600; September 30, $72,600; October 31, $73,600; November 30, (the last before the fire), $71,100.

Plaintiffs' records consist of their Cash Book, Purchase Book, Sales Book, Accounts Receivable Book, Accounts Payable

Book, Shipping Book, General Ledger, Purchase and Sales Invoices, Freight Bills (except in cases where deliveries to the warehouse were made by truck), and two separately cased sets of stock cards classifying the types of waste and recording the number of bales received into and shipped from the Exchange Street warehouse, and a smaller overflow warehouse referred to in the testimony as the "Fair Grounds" warehouse, each card carrying the name of the warehouse to which it applied. Another card, with supporting memoranda, showed waste stored in a public warehouse at Thomaston, Georgia.

The plaintiffs' proofs of loss include only waste claimed to have been located inside the Exchange Street warehouse, excluding any on the yard, and the furniture and equipment. They are comprised of 66 separate items of various types and values, aggregating 896,276 pounds, of a claimed total value of $80,291.40.

They were compiled, according to their undisputed testimony, by balancing the stock cards against invoices to determine pounds, types and grades. One or more truck deliveries on the morning of the fire were added, though, for lack of time, no stock card entry had been made.

The money loss was calculated by applying the market price, as determined by their experience and knowledge of market conditions, to the various types and grades, and adding 50 cents per cwt. for handling charges. They had two unfulfilled sales contracts, and on these, they claimed the contract sales price.

The defendants employed Mr. A. C. Dawson, an accountant, of Greenville, South Carolina, to check the proofs of loss against the plaintiffs' records. He commenced work about 30 days after the fire. The plaintiffs and their employees made all their records continuously available to him, allowing him, whenever he chose, to remain in the office to work after they had left at the close of business.

He reported that the Sales Book reflected sales for a period of approximately two months for which supporting invoices were not found, and plaintiffs wrote to these purchasers authorizing and requesting them to furnish copies of the invoices to Mr. Dawson and any other information he might request. He testified that all but about five were thus cleared up. He pursued this no further.

After considerable delay, Mr. Dawson reported to plaintiffs that he could not determine their loss from their records, whereupon plaintiffs employed Mr. L. C. Dodge, certified public accountant, of Spartanburg, South Carolina, to verify the proofs they had filed from their records and to assist Mr. Dawson in completing the work he had undertaken.

Mr. Dodge, taking the proofs of loss, item by item, assembled and segregated the supporting records for each, adjusted any variances disclosed, corrected arithmetical errors, and disallowed a few which he could not support by the records, plus satisfactory explanations, and reached a result increasing the amount of waste destroyed, above that claimed in the proofs of loss.

He reduced the result to a written itemized worksheet, keyed to the proofs of loss, and offered it, with the supporting records, to Mr. Dawson, who, after examining two or three items, refused to accept the explanation of one of them and rejected Mr. Dodge's audit. Mr. Dawson "would not check" Mr. Dodge's audit, "and definitely refused to do so".

This worksheet and the supporting records were introduced and Mr. Dodge described the method pursued in reaching the result substantially as follows: Beginning with the stock cards which showed a balance on hand, the original invoices for the incoming shipments were examined and attached; then the Sales and Shipping Books were checked to ascertain whether any more had been shipped out than the card reflected, such check continuing from the date of the oldest supporting invoice to the date of the fire. Where no unrecorded shipments were disclosed, the item was accepted as verified by the records. Shipments by rail were further verified by assembling and attaching the corresponding freight bills. Some shipments were by truck and for these there were no freight bills, though the invoices were found. Mr.

Dodge accepted the plaintiffs' explanation that these shipments were trucked, and the nearby location of the mills from which they came corroborates both its reasonableness and probable truth. He found 909,-205 pounds destroyed in the Exchange Street warehouse, as against 896,276 pounds claimed in plaintiffs' proofs of loss.

Less than half a dozen of the items of the proofs of loss approved by Mr. Dodge are not supported by invoices or freight bills. I am convinced that he was justified in allowing these upon the explanations furnished, and plaintiffs' other records.

The defendants, while admitting a total loss by fire, with their insurance in effect, offer nothing to show how much or how little it was. While not controverting plaintiffs' records, they criticize them as not showing the claimed loss exactly. While not denying liability, they assert complete non-liability, saying that plaintiffs' records prove nothing, furnish no basis from which their loss can be ascertained, and fail to meet the requirements of the above quoted policy provisions.

To support this contention, they mainly rely on their accountant, Mr. Dawson. His testimony and demeanor on the stand manifested a determination to refuse cooperation with the plaintiffs and their accountant either to verify or correct the proofs of loss submitted. After certain of his objections were satisfactorily explained, he said that he had a number of others (10 pages of them), but refused to disclose them, saying that he represented the insurance companies and the information he had was for them alone. Although plaintiffs' accountant tendered him the tabulated result of his work and the supporting records, he refused to examine it, saying, "If you have not completed the information that I feel proper and necessary, I will not waste my time going into the records. When you get the information, let me know." Though he began work more than nine months before the actions were brought, he reached no conclusion and brought to court none of his office records or worksheets from which any appraisal of his efforts could be made. Though I suggested to him that he tabulate the invoices plaintiffs relied upon by date and cost price, and file the tabulation as an exhibit, he has failed to do so.

Since Messrs. Winn & Winn, in a much shorter time, reached and reported a conclusion, of value and assistance to me, and, in the main, supporting Mr. Dodge's findings, I am reluctantly convinced that Mr. Dawson devoted no earnest effort toward ascertaining any loss.

Mr. Winn testified that plaintiffs' records were in very good order, considering the time elapsed and the number of people who had handled them, and that, beginning with the opening inventory of January 1, 1944, adding the purchases and subtracting the sales, as disclosed by the purchase and sales invoices, to December 20, 1944, he found on hand as of that date, a total of 1,254,732 pounds of waste, plus 57 unidentified bales, and 2,800 bundles of ties. He did not allocate this poundage among the storage points. However, test-checking his result by Mr. Dodge's method, and deducting the amounts stored in the Fair Grounds and Thomaston warehouses, as recorded on the applicable stock cards introduced, his report gives plaintiffs a total of approximately 915,000 pounds of waste, which would thereby be automatically allocated to the Exchange Street warehouse. Not only is this over-all quantity greater than that claimed in the proofs of loss, but the quantities of the several higher types are also greater.

Furthermore, the Winn report shows more of certain types of the lower grades of waste sold than the balancing of purchase and sales invoices show to be on hand. These quantities were all deducted in stating his ultimate total above. This corroborates Mr. Crowley's explanation, accepted by Mr. Dodge, that the balancing of the stock cards reflected the results of the sorting and rebaling operations. Unsupported items of the claim have been eliminated by the plaintiffs' accountant. They have gone beyond the requirements of the policy and the standards of ordinary business courtesy in assisting the defendants and their accountant to establish their proofs of loss, furnishing all the records they had, writing for those reported missing and employing an accountant to cooperate with and assist the insurers' ac-

countant. No instance of failure or reluctance to cooperate on their part is disclosed by the record.

■ It follows that the records conclusively establish that there was an amount of waste destroyed in the Exchange Street warehouse fire equal to, if not exceeding, that claimed in the proofs of loss. It had, at least, the value of its cost plus freight and handling charges when destroyed.

In their objections to the testimony at the trial and in the positions taken in argument before me, defendants' counsel insist upon a literalness of interpretation and a mathematical precision in record proof that I doubt ever was, or ever will be afforded by the records in any merchandise fire loss.

Their contentions, on further examination and analysis, seem to insist, not so much upon a literalness of construction, as upon the interpolation of terms and conditions in the policy provisions relied on, not yielded by a reasonable construction of the language used.

■ They describe these provisions as the "modern iron-safe clause", insisting that it is the legal equivalent of the older policy clause which acquired the name "Iron-safe clause" through a long history of legal construction.

The parallel is not sustained by an examination and comparison of the two clauses. The old "iron-safe clause" required (1) that the insured take a complete inventory of stock on hand once a year or within 30 days of the issuance of the policy; (2) that a set of books be kept "which shall clearly and plainly present a complete record of the business transacted, including all purchases, sales and shipments, both for cash and credit, from date of inventory"; (3) that the inventory and the books be kept locked in a fire-proof safe at night or when the place was not open for business, and (4) that "in the event of failure to produce such set of books and inventories for the inspection of this company, this policy shall become null and void and such failure shall constitute a perpetual bar to any recovery thereon".

The policy provisions here involved are introduced by the catch-phrase, "Require-

ments in case of loss". They refer to nothing to be done by the insured antecedent to a loss. The requirements, all becoming operative only after a loss, are, in brief: (1) Immediate notice of loss in writing; (2) protect property from further damage, separate damaged and undamaged property, putting it in best possible order; (3) furnish a complete inventory of the destroyed, damaged and undamaged property, stating the quantity and cost of each article and the amount claimed thereon; (4) render, within 60 days after the fire, in writing, a proof of loss sworn to by the insured; (5) exhibit to any person designated by the insurance company all that remains of the insured property and submit to examinations under oath by any person named by the company, and, as often as is reasonably required, "shall produce for examination all books of account, bills, invoices and other vouchers or certified copies thereof, if the originals are lost", and permit copies and extracts to be made.

I find nothing suggesting that the proof of loss must be established exactly and wholly from the insureds' written records. Defendants' counsel describe the loss as "an out of sight loss", which, in insurance circles, means that nothing was left to view, to recondition or to inventory. These are conditions subsequent to the loss, while the requirements of the old "iron-safe clause" are conditions precedent.

■ No particular is pointed out in testimony or argument wherein the provisions of the policies here involved were not fully complied with by the plaintiffs. They furnished all they were asked for, in fact, all they had. The defendants' accountant had all the records, or access to them, from January, 1945, to October, 1945. Defendants made no effort, either under the policy provisions, or the Rules of Civil Procedure, to examine the plaintiffs under oath, until two days before the trial before me without a jury, when defendants' counsel, on a motion for a further pre-trial conference, said that they desired to examine the plaintiffs. Since the suit had been brought on October 26, 1945, removed to this Court on December 10, 1945, set for trial at the February, 1945, term, and con-

tinued on defendants' motion, I saw no reason why the plaintiffs should be examined out of court on the single day intervening before they would be examined before me in open court.

■ Furthermore, even if the policy provisions relied on could be construed as the legal equivalent of the old "Iron-safe clause", and to be similarly applied, the amount, cost and type of waste destroyed was conclusively established by ample, undisputed, convincing and legally sufficient testimony. The character of the proof fully measures up to the requirements of South Carolina law, under which a substantial compliance is sufficient, the clause construed most strongly against the insurer, parol testimony to explain the records received, and the proof of loss deemed established, if the data furnished enables a person with average intelligence to make a fair estimate of the loss. McMillan & Son v. Insurance Co. of North America, 78 S.C. 433, 58 S.E. 1020, 1023, and cases cited.

As the Court said in the case cited, "under any ordinary system of bookkeeping some reliance must be placed upon parol testimony in explanation to show stock on hand at any particular time". And, further, "The object of the iron safe clause is to secure the means of showing with reasonable ease and certainty the extent of the loss by fire destroying the stock of merchandise, and it serves to protect the insurance company against an ignorant or fraudulent overestimate of the loss by the assured. The law, however, does not require a strict literal compliance with this clause by the assured, but is satisfied by a substantial compliance which reasonably meets the end in view. Liverpool & London & Globe Ins. Co. v. Kearney, 180 U.S. 132, 21 S.Ct. [326,] 327, 45 L.Ed. 460; Western Assurance Co. v. Redding, [5 Cir.,] 68 F. 708, 15 C.C.A. 619; Western Assurance Co. v. McGlathery, 115 Ala. 213, 22 So. 104, 67 Am.St.Rep. 26; North British & Mercantile Ins. Co. v. Edmundson, 104 Va. 486, 52 S.E. 350." See also, Madden & Co. v. Phoenix Insurance Co., 70 S.C. 295, 49 S.E. 855, where it was held that whether purchase invoices and the cash and credit sales books amounted to a substantial compliance with the requirements of the "iron-safe clause" was a jury question, and the verdict for the insured sustained on appeal. Also, Cobb & Seal Shoe Store v. Aetna Insurance Co., 78 S. C. 388, 58 S.E. 1099.

The proof for plaintiffs is more complete and more convincing than that held sufficient in Taubman v. Allied Fire Ins. Co., 4 Cir., 160 F.2d 157, under Maryland law, notwithstanding the rule in Maryland requires strict rather than substantial compliance with the "iron-safe clause", as indicated by the cited case of Reynolds v. German American Ins. Co., 107 Md. 110, 68 A. 262, 15 L.R.A.,N.S., 345, "These provisions are uniformly upheld as promissory warranties to be strictly performed to entitle the insured to recover for a loss."

Dickerson v. Franklin Nat. Ins. Co. of New York, N. Y., 4 Cir., 130 F.2d 35, strongly relied on by defendants, affords no support for their contentions, because of the wide factual dissimilarity. There the old "iron-safe clause" was involved and the scantiness of the records relied on, by contrast, sharply emphasizes the substantial completeness of the records furnished by the plaintiffs here, the sufficiency and integrity of which are manifest without invoking the indulgence accorded to untutored bookkeeping methods, thus stated by the Circuit Court of Appeals for the Fifth Circuit in Western Assur. Co. v. Redding, 68 F. 708, 710: "Viewed as 'a set of books,' from the standpoint of an expert in that scientific system of bookkeeping which obtains in the business of an insurance company * * * these books in evidence are primitive to a degree that may test his temper, if not his skill; but to impartial jurors, patiently searching for proof to support a recovery on a contract of indemnity for a loss insured against, and incurred without fraud or fault on the part of the insured, these books tell a plainer story than the expert unconsciously or strenuously looking to them for ground of forfeiture was able to read in them. * * * To our view, the very imperfections of these books vouch their good faith."

The Dickerson case, supra, also recognizes the rule that only substantial compliances with the "iron-safe clause" is required, and that it is a jury question whether the records "presented, in substantially complete form, evidence from which the state of the plaintiffs' business could be fairly determined". The records presented in the Dickerson case "consisted of invoices and were held to satisfy 'the general requirements of the rule as to the character which such records should have'." Lumbermen's Mut. Ins. Co. v. Johnson Lumber Co., 5 Cir., 53 F.2d 940.

I cannot accept plaintiffs' theory that market price is the proper measure of the money loss, although the testimony as to market price is undisputed. The undertaking of the insurers is to make good any loss, to the extent of the coverage, not exceeding the actual cash value of the property destroyed "or the amount which it would cost to replace the same with material of like kind and quality within a reasonable time after the loss". While it is earnestly urged that "market price" and "replacement value" are legally synonymous, it seems to me that "market price", presumably, at least, would include some profit to the dealer, and reflect what he would expect to realize on sales.

While conceding that the testimony discloses no change in the OPA ceilings applying to the various cotton mills from which they buy, they argue that the undisputed testimony shows the custom of the mills to sell their entire production in advance for periods of three to six months, and, consequently, other dealers are the only available replacement source. They emphasize the hardship resulting from an unfilled contract for the sale of 60,000 pounds of Comber waste to Fulton Bag Company at 14¾¢ per pound, they had to fulfill after the fire by purchasing the amount on the market at 16½¢ per pound.

Notwithstanding the holding that OPA ceilings do not determine value in Tierney v. General Exchange Ins. Corporation, D.C.Tex., 60 F.Supp. 331, (where an automobile was destroyed by fire), and in Fugate v. State, Okl.Cr. 158 P.2d 177, 157 A.L.R. 1299 (where the ceiling price of stolen property was not allowed to reduce the value to change the crime, from grand to petit larceny), it is my view that plaintiffs are limited to cost price of goods destroyed, plus freight paid, and 50¢ per cwt., the reasonable handling charge under the undisputed testimony.

The testimony does not show that the cotton mills are exhausted as a source of replacement. And, while it is a hardship on the plaintiffs that they sustained an out-of-pocket loss of more than $1,000, in fulfilling the Fulton Bag Company contract, in addition to their profit in it, I am convinced that the loss is not recoverable to any extent above cost, freight and handling. There is no testimony upon which the cost of truck transportation can be allowed, and the plaintiffs would suffer some disadvantage in this respect under the measure of damages I feel compelled to adopt, except for the circumstance that the loss, established under that measure, exceeds the combined coverage of the insurers.

The amount of the loss established on this basis, computed by the testimony, is: Net cost of merchandise destroyed, $70,-413.41; handling charges (limited to 896,-276 pounds, the amount stated in the proof of loss) $4,481.38; freight (also limited to the bills and invoices supporting the claim) $1,215.51, totalling $76,110.30.

Formal findings of fact and conclusions of law are herewith filed, and the plaintiffs may enter judgment against each defendant for the sum of $37,500, with six per cent. interest from March 15, 1945, and costs.