FRANK M. REYNOLDS use of J. L. G. LEE, Trustee, *vs.* THE GERMAN AMERICAN INSURANCE CO.

*Fire Insurance Policy Issued Before Payment of Premium—Iron Safe Clause Requiring the Insured to Take Inventory Within Time Limited—Policy Avoided by Non-Compliance.*

When an agent issues a policy of fire insurance without collecting the premium, but making himself responsible therefor to his principal, the insurance company, and giving credit to the insured, the policy is valid, unless it is therein expressly provided that the risk shall not attach until the premium is actually paid.

An insurance agent agreed to insure certain property against fire, and said to the owner that he was insured from that day, and on the next day, sent to him by mail a policy which covered the risk from that time. A month afterwards, the insured took the policy to the agent, caused a mistake in it to be corrected, and then paid the premium. *Held,* that since the policy did not provide that it should not be binding until the premium was actually paid, it was in effect and valid from the time originally issued, and not from the day the correction was made and the premium paid.

A fire insurance policy provided that, "the assured will take a complete itemized inventory of stock on hand at least once in each calendar year, and unless such inventory has been taken within twelve calendar months prior to the date of this policy, one shall be taken in detail within 30 days of issuance of this policy, or this policy shall be null and void from this date, and upon demand of the assured the unearned premium from such date shall be returned." *Held*, that this stipulation is valid, and full effect should be given to it according to the agreement of the parties. If the assured fails to take an inventory within the time limited the policy becomes void, and it is not revived by his making an inventory afterwards, and before a loss by fire.

The taking of an inventory fourteen days after the policy had become void, under this clause, is not a substantial compliance with its terms.

*Decided December 4th, 1907.*

Appeal from the Baltimore City Court (PHELPS, J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*John C. Rose* and *John L. G. Lee*, for the appellant.

*S. Johnson Poe* and *Edgar Allan Poe*, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellant sued the appellee on an insurance policy, for a loss alleged to have been sustained by a fire, which occurred on February 20th, 1906, and destroyed his stock of merchandise. The case was taken from the jury on the ground that the policy issued by the appellee was null and void, by reason of the appellant failing to comply with what is called the "Iron Safe Clause," which was attached to the policy. The part of that clause involved in this case is as follows:

"Iron Safe Clause.

Warranty to keep Books and Inventories, and to produce them in case of loss.

The following covenant and warranty is hereby made a part of this policy:

1st. The assured will take a complete itemized inventory of stock on hand at least once in each calendar year, and

unless such inventory has been taken within twelve calendar months prior to the date of this policy, one shall be taken in detail within 30 days of issuance of this policy, or this policy shall be null and void from this date, and upon demand of the assured the unearned premium from such date shall be returned."

Then follow other provisions not especially relied on in this case. The policy was dated December 22nd, 1905, and insured the appellant "for the term of one year from the 22nd day of December, 1905, at noon, to the 22nd day of December, 1906, at noon." The appellant's store was at Level, Harford County, Md., and the policy was issued by D. B. Record, an agent of the appellee, whose office was at Belair, in that county. The appellant testified that Mr. Record visited his store on December 22nd, 1905, and agreed to issue him a policy for the amount of $1,500 on his stock of goods, and told him "that he would send him the policy, but that in the meantime he was insured from that date on his stock of goods for $1,500, the amount asked for and agreed to be given by Record as agent of the defendant company." He received the policy by mail on the 23rd or 24th of December and upon examining it he found that the typewritten slip attached to it contained the figures $1,000, instead of $1,500 which was the amount agreed upon, although written in the body of the policy, and in figures on it, the amount stated was $1,500. The appellant kept it in his possession until the 29th of January, 1906, when he showed it to Mr. Record at Belair, called his attention to the difference between the amount named in the policy and that on the slip, and "thereupon, at his request and in his presence, Record struck out the figures 1,000 on the slip and wrote over those figures the figures 1,500 as they now appear on the policy." On the same day the appellant "paid to Record the sum of $32.81, being the premium on the policy for a year from December 22nd, 1905, to December 22nd, 1906."

He also testified that the last inventory taken by him before the policy was issued was begun December 4th, 1904, and

completed December 8th, 1904, and he took no inventory from that time until the one he began on February 1st, 1906, and completed on February 6th,—the fire occurring on February 20th.   Mr. Record testified that the statement of the appellant that he had told him he was insured from December 22nd, for $1,500 was correct, and that he had authority from the company to make such statement; that the figures $1,000 were written on the slip by mistake by his typewriter.   He also said that "when his attention was called by plaintiff to the clerical error in the policy as above stated, the strictly regular and formal way would have been to write an entirely new policy, but it was late in the afternoon when plaintiff called and he was in a hurry and witness corrected it in the way stated as a short cut to make the correction," although he did not say that he so told the appellant, when he called his attention to the error.

1. The appellant contends that the appellee was bound by the policy for three reasons, which we will consider in the order followed in the appellant's brief: "1. Because the policy was not perfectly issued until January 29th, and as the inventory was taken February 1st to 6th, it was taken within thirty days of the true date of the issue of the policy, and therefore the Iron Safe Clause, no matter how construed, was literally complied with."   Although the prayers of the appellee do not refer to the pleadings, and hence they are not to be considered in passing on their validity, we cannot well avoid seeing that the plaintiff in its declaration alleged that "the defendant *on the 22nd day of December, 1905,* by its contract commonly called an insurance policy agreed to insure the plaintiff," &c.   But regardless of that, the appellant himself testified that he was to be considered insured from that date.   If a fire had occurred on December 30th, could there have been any doubt about the right of the appellant to recover?   The time of payment of the premium was a mere question between the appellant and the agent, so far as disclosed by the record.   In the absence of some provision in the policy providing that it should not attach until the premium was actually paid, there

could be no doubt about the validity of it, and it would not be invalid merely because the premium had not been paid. That is a question, first, between the company and its agent and, then, between the agent and the insured. If the agent chose to run the risk of its payment, and the company was willing to look to him, the insured could not complain. The appellant not only owed this premium but the balance on another policy, which he paid by one check of January 29th. He not only did not claim that his policy was to run from the latter date, but he testified that he paid "the sum of $32.81, being the premium on the policy for a year from December 22nd, 1905, to December 22nd, 1906." His policy, which he had had in his possession since December 23rd or 24th, showed that it only insured him between those dates, and he doubtless knew that Mr. Record had made himself responsible to the company for the premium for that insurance—at least that is not unusual with agents.

There was in reality no difficulty about the policy. The correct amount of insurance was not only shown in figures on the body of the policy, but it was written out therein, and the mere fact that on the slip, which is primarily intended to describe the goods insured, there were the figures of $1,000 instead of $1,500, could have made no possible difference in case of loss. It was perhaps well enough to have it corrected, but if Mr. Record had written a new policy, there is no suggestion that he would not have written it to cover the same period of time that the other one did. As by the agreement the property had been insured since December 22nd, it was only fair that the premium should be paid from that time.

Authorities are cited to show that an insurance contract takes effect on delivery, and that the date of the policy is not conclusive evidence of delivery, but the testimony shows that this policy was delivered on December 23rd or December 24th, and was in the possession of the appellant from that time until the fire excepting for the few moments required to change the figures on the slip, which change we deem wholly immaterial and unnecessary. The case of *Wash. Fire Ins. Co.* v. *Davison*,

30 Md. 109, was cited to show that ",when a change in the pol- icy is made at the time the premium is paid the policy first becomes a binding contract from that time," but that policy provided that it should not be binding until the premium was actually paid, and the question was consequently disposed of on that ground.

2. The second reason given to show that the appellee was liable, is "because the clause in question, construed in accord- ance with the universally accepted canons of construction of like clauses in insurance policies, was complied with by the plaintiff." This clause is of comparatively recent use, but although it is stated in 13 *Am. & Eng. Ency. of Law*, 355, note 9, that the first case construing it appears to be *Goddard* v. *East Tex. Fire Ins. Co.*, 67 Tex. 69—decided in 1886—there have been a great many decisions sustaining it. It is said in 19 *Cyc.* 761, that "in order to expedite the proof of loss and to verify the honesty of the claim of loss, provisions are cus- tomarily inserted in policies upon stocks in trade requiring the insured to take an inventory at frequent intervals, to keep regular books, and to preserve all papers in an iron or fire- proof safe. These provisions are uniformly upheld as prom- issory warranties to be strictly performed to entitle the insured to recover for a loss." There are many cases cited in the note. In 13 *Am. & Eng. Ency. of Law*, 355, it is said of this clause: "While there was at first some disposition to ignore the clause when it was attached merely in the form of a rider and know- ledge of it was not brought home to the insured, it has now become well settled by adjudications which have multiplied rapidly during the few years of its existence that this clause is not only reasonable but even desirable, and that in ordinary cases it will be enforced." While it is true that insurance companies sometimes resort to such technical defenses as to shake the confidence of the public in them, it is also true that fraudulent claims for losses are not infrequently made against them—especially for the class of property covered by this policy. Honest merchants are interested in a reasonable protection against such fraudulent claims as they may cause the com-

panies to be stricter even with those who are honest, and may have the effect of keeping the premiums higher than they would otherwise be.   In saying this we do not mean to intimate that this appellant is not acting fairly and honestly, as there is nothing in the record to justify such an intimation, but we refer to a fact which is well known to exist.

There can be no doubt that the appellant did not comply with the requirements of this policy as to the inventory, and yet that is an important provision for the protection of insurance companies against excessive demands for losses.   Indeed it may be very difficult for a merchant to make anything like an accurate estimate of his loss, if he has not taken an inventory within a year.   If he has not done so when he insures, this clause allows him to do so within thirty days from the issuance of the policy, and it is attached to it in such way as to attract more attention than it would if printed in the body of the policy.

It may seem to be a hard rule to declare a policy forfeited for some act of omission or commission which in point of fact was not the cause of the fire, and actually did no injury to the insurer, but when parties enter into contracts which are not prohibited by law, and are declared by the Courts to be reasonable regulations, upon what principle can a Court revive a policy, which by its terms was null and void, simply because the insurer sustained no injury by reason of the insured's failure to do what is required of him ?   After this policy became null and void the insured could not by his act alone revive it, so as to bind the insurer.   So far as is disclosed by the record, neither the company nor its agent was aware that the appellant had not complied with his part of the contract, as he knew it, or is presumed to have known it, he could have protected himself by a new policy.   If taking an inventory ten days after the time allowed be sufficient to revive the policy, why would ten months not have been ?   The policy was either valid or invalid after the thirty days, and if valid when the inventory was taken, it would still have been so until December 22nd, 1906, so far as this clause is concerned.   If

an insured sell his property during the term of a policy, and it thereby becomes invalid under the clause in standard policies, could he revive it by repurchasing the property? In discussing the subject of "Revival of Policy," it is said in 19 *Cyc.* 709, "If, however, the provision be that a forfeiture occurs upon a breach, that is, that the policy shall become void, the removal of the situation causing a breach of condition should not operate to revive the policy without the consent of the insurer." And again, in speaking of illegal use of the premises, it is said, "When once a policy has become void by its terms, it is not revived by a termination of the illegal appropriation." *Ibid,* 723. That work also says, "If the policy contains a stipulation that it is to be void if the premises shall become unoccupied or vacant, re-occupancy after a breach does not revive the forfeited policy," *Ibid,* 728. "Under the clause of a fire policy making it *void* if any unauthorized hazardous trade, increasing the risk, is carried on in the building, the fact that such trade was carried on avoids the policy, no matter what was the cause or origin of the fire; or that such trade was carried on by the tenant of the assured without his knowledge or consent." *Howell* v. *Balto. Eq. Soc.,* 16 Md. 377. See also *Liverpool Co.* v. *Gunther,* 116 U. S. 130; *Rowland's case,* 66 Md. 236.

This Court has declared that there can be no recovery on insurance policies, which provided that they should be void under certain conditions, in a number of cases—amongst others, *Bowman* v. *Ins. Co.,* 40 Md. 631, where there was a judgment against the insured, which was not made known to the insurer; *Weaver's case,* 70 Md. 536, where there was a mortgage; *Houghton's case,* 92 Md. 68, where the insured had agreed in writing to sell the property; *Turnbull's case,* 83 Md. 312, where gasoline was kept on the premises, although it was not the cause of the fire and other instances might be cited. It was said by JUDGE McSHERRY in *Agric. Ins. Co.* v. *Hamilton,* 82 Md. 88, that "In *Kelly's case,* 32 Md. 421, and in *Weaver's case,* 70 Md. 539, this Court repudiated the principle of interpretation adopted in some cases, that insurance

contracts are to be construed more strongly against the un-
derwriter; and adopted the sounder view that the intention of
the parties, as gathered from the whole instrument must pre-
vail." In this case there is no ambiguity, and there can be no
question about what was intended by the parties. As we have
seen, the weight of authority is not only to the effect that
such a provision as that under consideration is vaild, but it is said
to be *desirable.* When then the parties entered into the con-
tract, embraced in the policy, and expressly agreed that the
policy should be null and void, unless an inventory was taken
as therein required, there could be no justification for the
Court setting aside the terms of the contract, because the in-
sured, subsequent to the thirty days, did what he was re-
quired to do within that time, in order to keep the policy in
force. If there was evidence of waiver another question
would arise, but there was no sufficient evidence to submit to
the jury on that subject.

3. It is contended that a substantial and not a literal com-
pliance with this clause is all that is required, and that the
insured substantially fulfilled the requirements of the clause.
Much of what we have said above is applicable to this point.
It cannot be said to be a substantial compliance with such a
requirement, to take an inventory fourteen days after the pol-
icy has become null and void. If the company was to be
held liable, it had the right to have such an inventory in exis-
tence during all the time its policy was in force, excepting in
so far as it had agreed to the contrary—during the thirty days.
Not taking any inventory during that time is a very different
matter from taking one in a way which might not be con-
sidered perfect. Methods of book-keeping, taking inventories,
&c., may differ, and those adopted in an ordinary country
store cannot be expected to be as thorough as those followed
by experienced book-keepers and merchants. A *substantial*
compliance in such respects might answer, but *no* compliance
is altogether a different question. It would have a tendency
to cause utter confusion and uncertainity, for courts to under-
take to determine what would be a substantial compliance

with such a contract as this, if they be permitted to say what time within the eleven months would be a "substantial compliance" with it. The logical conclusion of the appellant's construction would be that if a fire occured just before the close of the year embraced by a policy, the insurer could not complain, if the insured completed an inventory the day before the fire. Such a construction would make a new contract for the parties. It is very much better for the insured, if he be careless or negligent, to know that he must take the inventory within a fixed time, than to let him carry the risk of taking one before a fire occurs. If this stock had burned before the inventory was taken, but after the thirty days, it could hardly be contended that the appellant could have recovered. The safe course for the insured and the insurer is to have plain, definite terms in their contract and to require each to comply with them, if they be reasonable, unless waived or changed by mutual consent.

So although we regret that the appellant must sustain a loss by his unfortunate neglect to comply with his part of the contract, we are of the opinion that the second prayer was properly granted, and therefore we need not discuss the first, but will affirm the judgment.

*Judgment affirmed, the appellant to pay the costs above and below.*