The FIRST NATIONAL BANK AND TRUST COMPANY OF WESTERN MARYLAND, a corporation, Successor to the Second National Bank of Cumberland

v.

SECURITY MUTUAL CASUALTY COMPANY, a corporation, Chicago, Illinois.

Civ. No. 17660.

United States District Court
D. Maryland.

May 28, 1968.

Gunter & Geppert and William H. Geppert, Cumberland, Md., and Benjamin C. Howard and Alan R. Sachs, Baltimore, Md., for plaintiff.

Semmes, Bowen & Semmes and William A. Fisher, Jr., Baltimore, Md., and Theodore J. Tsoumas, Chicago, Ill., for defendant.

THOMSEN, Chief Judge.

This action has been brought by plaintiff to recover under a certificate of insurance issued by defendant (the Company) to Second National Bank of Cumberland, which was later merged into plaintiff. Plaintiff and the Second National Bank will be referred to collectively as "the Bank".

The certificate was issued to provide "Dealer Fraud Insurance" to the Bank under a policy issued by the Company to American Installment Credit Corporation. The Company agreed to insure the Bank "[i]n accordance with the provisions and stipulations of, and up to the coverage limits set forth in the 'Dealer Fraud Insurance' form attached to and forming part of this Certificate". The insurance was for a period of one year, from December 1, 1962, to December 1, 1963, and was renewed by the payment of an annual premium through the year December 1, 1965, to December 1, 1966.

The Bank claims a loss arising out of certain "wholesale transactions", as that term is defined in the Dealer Fraud Insurance form, quoted below, by reason of certain sales out of trust made by Jim Beamer Ford Sales, Inc. (the Dealer), to which the Bank had loaned money "on a secured Floor-Plan basis".

The Company contends: I. that the Bank failed to comply with certain "Conditions" set out in the form, quoted below; specifically, that the Bank failed to make certain physical inspections;[1] failed to make demands on the Dealer for payment;[2] failed to notify the Company promptly of circumstances which came to the Bank's knowledge indicating or tending to indicate that a loss might ensue;[3] and failed to give notice of the loss as soon as practicable;[4] II. that such failures bar recovery herein, without the need for the Company to show prejudice therefrom; but III. if the Company must show prejudice because of such failures, or any of them, it has proved such prejudice; and IV. that acquiescence by the Bank in repeated sales out of trust by the Dealer over the years also bars recovery.

### Facts

The Dealer Fraud Insurance form provided in pertinent part:

The Company—

" * * * agrees to pay and make good to [the Bank] 85% of any direct loss sustained by the Bank by reason of its dealings with Dealers * * *.

"INSURING CLAUSES

" * * *

"3. By reason of the misappropriation, conversion or theft by a Dealer (customer of the Bank) or by any officer, clerk, servant or employee of such Dealer, of any personal property in which the Bank has acquired an interest in the usual course of business

---

1. As required by the first paragraph of Condition (d).

2. As required by the second paragraph of Condition (d).

3. As required by the second paragraph of Condition (e).

4. As required by Condition (f).

or of any monies payable with respect thereto or of any proceeds of a sale of such personal property."

"DEFINITIONS

"The term 'Dealer' as used herein shall be any person, firm or corporation regularly engaged in the sale of merchandise and who or which in the course of business borrows from the Bank on a secured Floor-Plan basis or acquires chattel mortgages, conditional sales contracts or other instruments of writing which are subsequently sold or assigned to the Bank in the usual course of business and/or as security for any indebtedness to the Bank.

"The term 'wholesale transactions' as used herein shall mean a transaction secured by a trust receipt, chattel mortgage or other similar instrument calling for payment in full within a period of not more than eighteen (18) months in all including renewals or extensions, and arising out of the purchase at wholesale of motor vehicles of all descriptions, * * *.

"CONDITIONS

"IT IS UNDERSTOOD AND AGREED THAT—

"BANK PARTICIPATION

"(a) The Bank shall bear uninsured 15% of each loss.

"COVERAGE LIMITS AND DEDUCTIBLE

"(b) The Company's liability shall be limited to $100,000.00 any one loss excess of $5,000.00 any one loss, and to the sum of $250,000.00 in respect of all claims hereunder. (sic)

"PREMIUM PAYMENT [5]

"(c) * * *

"INVENTORY CHECKS AND REPORTS

"(d) It is agreed that once each month during the term of this insurance the Bank will make a physical inspection of each item of personal property covered under the wholesale transactions and prepare a written report of such inspections in form prescribed by American Installment Credit Corporation, which is to be retained in the files of the Bank. It is further understood and agreed that if the Bank shall fail to make a physical inspection of each item of personal property of any Dealer and prepare the written report as called for herein, the Bank shall forfeit the right of recovery of any claim under Insuring Clause 3 for loss in respect of any item of personal property covered under any wholesale transaction, involving such Dealer, occurring subsequent to the date on which the Bank should have physically inspected the personal property and prepared a written report, with the understanding that when such failure to inspect and report shall have been corrected to the satisfaction of the American Installment Credit Corporation the Bank's right of recovery shall be reinstated as to losses occurring subsequent to the date upon which such correction was approved by the American Installment Credit Corporation.

"It is further agreed that if upon such inspection any item of personal property financed by the Bank under said agreement be missing or unaccounted for, the Bank shall demand in writing of the Dealer involved full payment or satisfactory accounting therefor within fifteen (15) days after such inspection was made, and failure on the part of the Bank to make such demand shall result in the Bank's forfeiting its right of recovery of any claim under Insuring Clause 3 for loss in respect of such missing or unaccounted for item of personal property. * * * Each such missing automobile must positively be located and inspected by the Bank's inspector on the next regular inspection date; otherwise the Bank must demand of the Dealer involved immediate payment in full therefor.

---

5. The necessary premiums had been paid.

## "INSPECTION OF RECORDS

"(e) It is understood and agreed that the Company or its representatives may at any time have the privilege of inspecting the Bank's books, records and inventory inspection reports for the purpose of determining the amount of wholesale and retail transactions in respect of which this insurance applies and the manner in which they are maintained by the Bank.

"The Bank shall promptly notify the Company of any fact or circumstance which shall come to its knowledge indicating or tending to indicate that a loss under this coverage may ensue. The Bank shall make all reasonable efforts to recover any loss from the Dealer.

## "NOTICE OF LOSS AND SUBROGATION

"(f) Written notice of any loss shall be given as soon as practicable by the Bank to American Installment Credit Corporation, Washington, D. C., together with all such particulars for the purpose of identification and other information as may be in its power. The Company upon payment of any loss hereunder, shall become subrogated to all rights and remedies of the Bank in respect of such loss.

## "LOSS COMPUTATION

"(g) In computing the amount of loss under this insurance, all equities held by the Bank shall first be applied in reduction of the loss, and unearned interest and unearned service charges upon items comprising the loss shall be excluded."

At various times during the years 1962 through 1965, the Bank loaned money to Jim Beamer Ford Sales, Inc. (the Dealer) "on a secured Floor-Plan basis" in "wholesale transactions" within the meaning of the policy.

Almost from the beginning the Dealer made some sales out of trust. Until the summer of 1964 the Bank made monthly inspections, as required by the first paragraph of Condition (d). But the Bank did not comply with the second paragraph of Condition (d). It did not make any written demands on the Dealer to make payment for the items sold out of trust. Nor did the Bank make any oral demands that the Dealer make such payments within fifteen days or within any other specific period; the Bank merely inquired when payment would be made and urged the Dealer to pay as promptly as possible. The Dealer usually made payment within a couple of months.

The representative of the Bank who made the periodic inspections prepared and preserved the reports of inspection referred to in Condition (d), but until March 1965 the Bank did not notify the Company of any loss or of any facts indicating or tending to indicate that a loss might ensue, as required by Condition (f) and by the second paragraph of Condition (e), respectively.

In August 1964 and October 1964, the Bank failed to make the required monthly inspection, and the number of sales out of trust increased notably thereafter, as reflected by the inspection reports: from three cars in July, to nineteen cars in September, and eighteen cars in November.

In November 1964, the Bank became alarmed, and took additional security from the Dealer in the form of a first mortgage for $60,000 on certain real estate. In January 1965, the Bank took a second mortgage from the Dealer covering additional properties in the amount of $180,000, and a judgment note for $35,000. Still the Bank did not notify the Company. On February 13, 1965, a fire occurred in an underinsured property covered by the second mortgage. On March 18, 1965, the Bank, for the first time, gave telephone notice of the facts to the Company, following this by a written notice on March 22, 1965.

*Discussion*

No case anywhere involving "Dealer Fraud Insurance" has been cited or found. It is clear, however, that "Dealer Fraud Insurance" is a kind of commercial insurance, more like fidelity

insurance and property insurance than like automobile liability insurance, where the rights of injured third parties are usually involved.

Whether or not any "conditions" have been breached and the effect of any such breaches are matters arising in connection with the performance of the contract, and are governed by the law of the place of performance.[6] All acts of performance by the Bank were to be performed in Maryland or West Virginia, and were initiated from the Bank's Cumberland, Maryland office. It appears, therefore, that Maryland law should determine whether the Bank has complied with the contract provisions and the effect of any non-compliance. However, neither party has suggested that there would be any material difference between the law of Maryland and the law of West Virginia, nor between the law of either of those States and the law of Illinois, where the certificate of insurance was apparently issued.

The Company contends that the Bank failed to comply with the first paragraph of Condition (d), quoted above, which required the Bank to make a physical inspection of each item of personal property (i. e., each automobile) covered under the wholesale transactions, and prepare a written report of such inspections. It was further agreed that if the Bank should fail to make a physical inspection of each item and prepare the written report, the Bank should forfeit its right of recovery for loss in respect of any item of personal property covered under any wholesale transaction involving such Dealer (here, the Beamer agency), occurring subsequent to the date on which the Bank should have made such inspection and prepared such report, unless such failure were corrected to the satisfaction of the American Installment Credit Corporation. It is conceded by the Bank that it did not make the required inspections in August 1964 and October 1964 and that such failure was not corrected in accordance with the terms of the policy. The Bank contends, however, that such inspections were not a condition precedent to recovery,[7] and that no prejudice to the Company (the insurer) has been shown.

The Court agrees that the provision is a condition subsequent rather than a condition precedent,[8] but it does not necessarily follow that prejudice must be shown by the insurer. The *McConnaughy* case, see note 7, relied on by the Bank, dealt with an automobile liability policy, where the rights of an injured third party were involved. The Court emphasized that fact,[9] which distinguishes that case from decisions involving property or commercial insurance.[10]

In any event, this Court finds that prejudice has been shown in the present case. The Bank failed to inspect in August and October of 1964. The pattern of sales out of trust from July to December 1964 indicates that the num-

6. Keco Industries, Inc. v. ACF Industries, Inc., 316 F.2d 513 (4 Cir. 1963).

7. Citing Fidelity and Casualty Co. of New York v. McConnaughy, 228 Md. 1, 179 A. 2d 117 (1962); Watson v. United States Fidelity & Guaranty Co., 231 Md. 266, 189 A.2d 625 (1963); Warren v. Hardware Dealers Mutual Fire Insurance Co., 244 Md. 471, 224 A.2d 271 (1966); Ohio Casualty Insurance Co. v. Ross, 222 F. Supp. 292 (D.Md.1963).

8. See Corbin, Contracts, §§ 628, 633–635, 724, 726–727, 739, 743, 748 (1950).

9. "As the number of automobiles and accidents has continued to grow, it has increasingly been felt judicially that the first rule is unduly harsh, that liability contracts are at least in part third party beneficiary contracts and that it is in the public interest that those free of fault who are injured should be protected. As a result there have been many holdings that policy defenses should not prevail except where a miscarriage of justice would otherwise result. 8 Appleman, Insurance Law and Practice, Sec. 4773." Fidelity and Casualty Company of New York v. McConnaughy, 228 Md. at pp. 12–13, 179 A.2d at 123 (1962).

10. See, e. g., Reynolds v. German American Insurance Company, 107 Md. 110, 68 A. 262, 15 L.R.A.,N.S., 345 (1907).

ber of cars sold out of trust significantly increased during or immediately following the months in which the Bank failed to inspect. The Court finds that if the Bank had inspected, fewer cars would have been sold out of trust. Therefore, the collateral was diminished and the Company was prejudiced by the Bank's failure to comply with the inspection provision.

■ The Company also relies on the second paragraph of Condition (d), which requires that if upon inspection any item of property "be missing or unaccounted for, the Bank shall demand in writing of the Dealer involved full payment or satisfactory accounting therefor within fifteen (15) days after such inspection was made, and failure on the part of the Bank to make such demand shall result in the Bank's forfeiting its right of recovery of any claim under Insuring Clause 3 for loss in respect of such missing or unaccounted for item of personal property."

The Court finds that when an inspection disclosed that vehicles had been sold out of trust, the Bank did not make a written demand upon Beamer for payment; instead, a representative of the Bank would visit Beamer and ask him when he could pay. The Bank argues that these discussions amounted to an oral demand, and that an oral demand is substantial compliance with the policy.

The Court finds, however, that these conversations did not include or amount to any sort of demand for payment, within the intent and meaning of the policy.[11]

■ The Bank also argues that even if full payment was not properly demanded, the Bank did demand and receive "satisfactory accounting therefor," inasmuch as additional security was later received by the Bank. The Company urges, on the other hand, that the phrase "satisfactory accounting therefor", as used in Condition (d), means a satisfactory explanation as to why the property is missing at the time of the inspection, e. g., that the vehicle was temporarily in the possession of a prospective purchaser for a road test. The Company's position is the more reasonable, since it defines "accounting" in terms of a response to the problem, i. e., why the vehicle was not in the showroom or warehouse. If the vehicle was missing and not satisfactorily accounted for because it had been sold out of trust, the taking by the Bank of other collateral security does not satisfy the terms of Condition (d).[12]

■ Compliance with Condition (e) is another area of dispute between the parties. The first paragraph of (e) gives the Company the privilege of inspecting the Bank's records with respect to the insured transactions. The Bank has sug-

---

11. See Mutual Life Insurance Co. v. Ford, 61 Tex.Civ.App. 412, 130 S.W. 769 (1910) error denied, 103 Tex. 522, 131 S.W. 406. It is unnecessary, therefore, to decide whether an oral demand would serve the same function as the written demand called for by the contract, but it should be noted that if there had been a written demand, and a copy had been introduced into evidence, plaintiff would not have had to rely on unsatisfactory, contradicted, and in the last analysis incredible oral testimony.

12. A dispute arose as to whether Condition (d) required the Bank to demand that payment be made within fifteen days for any vehicle missing and unaccounted for, or merely that the Bank make a demand within fifteen days for payment. It is true that ambiguities must be construed against the insurer, which pre-

pared the contract, but when the provision in question is read in context, there is no ambiguity. The fifteen-day requirement undoubtedly applies to the payment or accounting for a missing vehicle and not to the demand. If such payment or explanation is not forthcoming, the policy contemplates and provides for prompt notice to the insurer. It would be inconsistent with these intentions to permit the Bank to wait fifteen days after discovering that the property is missing before it need even demand payment or an explanation, and then not place any limit on the time within which that payment or accounting be made. The provision does not say that "the Bank shall demand within fifteen days", but says that "the Bank shall demand * * * payment or * * * accounting therefor within fifteen (15) days after such inspection was made."

gested that this provision imposes a duty to inspect on the Company, but no authority to support that argument has been found, and the Court holds that the provision does not impose any such duty on the Company.

■ The second paragraph of Condition (e) requires the Bank to "promptly notify the Company of any fact or circumstances which shall come to its knowledge indicating or tending to indicate that a loss under this coverage may ensue". The Court finds that the Bank has failed to comply with this provision in that it did not promptly notify the Company of facts within the Bank's knowledge which tended to indicate that a loss might ensue. The evidence is clear that the Bank had known for many months, indeed for several years, that the Dealer had been selling automobiles out of trust. That fact alone, or coupled with the knowledge of the Bank that the defaults were not being promptly rectified, indicated or tended to indicate that a loss might ensue. Moreover, the evidence shows that on February 13, 1965, Beamer's furniture store burned down. Beamer had given the Bank a mortgage on that store on November 23, 1964, as additional security, without the knowledge of the Company. The property was underinsured, and it was quite clear after the fire that a loss would probably ensue;

yet the Bank did not notify the Company of the likelihood of a loss until March 22.

■ A similar issue is presented by the requirement in Condition (f) that written notice of any loss be given as soon as practicable by the Bank to American Installment Credit Corporation.

The Bank contends that both Conditions (e) and (f) were complied with because there was no "loss" until the additional security was sold and it was finally determined that it did not cover the amount of money owed to the Bank by Beamer.[13] On the other hand, the Company properly contends that a "loss" under the policy occurs either (1) when a car is sold out of trust, or (2) (a) if a demand has been made, fifteen days after the demand, in the event that no payment or satisfactory accounting for the whereabouts of the car has been made, or (b) if no demand has been made, fifteen days after a demand should have been made, in the event that no payment or satisfactory accounting has occurred. The Company's position is supported by cases and text writers dealing with analogous situations.[14] A determination of the amount of the recoverable loss may have to await the sale of the collateral. See Condition (g) above.[15]

For each and all of the foregoing reasons, judgment will be entered in favor of the defendant.[16]

13. When the security was sold, it was applied to the earlier out-of-trust sales. The Bank claims that the "loss" under the policy is the difference between the amount owed to the Bank by Beamer and the amount realized on the security.

14. See, e. g., Lewis v. Commercial Casualty Insurance Co., 142 Md. 472, 121 A. 259, 28 A.L.R. 1287 (1923); Dean v. Fidelity & Deposit Co. of Md., 233 App. Div. 392, 253 N.Y.S. 103 (1931), aff'd, 259 N.Y. 520, 182 N.E. 163 (1932); see Appleman, Insurance Law and Practice, §§ 702, 4773, 6714–6717 (1962).

15. In the analogous case of a fidelity policy, the amount of a loss may have to

await an inventory, but that does not excuse the need for reporting the occurrence of a loss. Such notice was not given in this case.

16. It is not necessary to pass on the questions whether the Bank's acquiescence over the years in the Dealer's sales out of trust estops the Bank from successfully pressing its claim in this case, or invalidated the renewals of the policy, at least with respect to transactions with Beamer, because of concealment by the Bank of essential facts to which the Insurer was entitled. See Appleman, supra, §§ 6192, 6194, 6197, 6202, 6216.